## PITTS v. STATE, 43 Miss. R., 472.

### HOMICIDE.

In cases of felonious homicide, the *corpus delicti* consists of two fundamental and necessary facts: First, the death; and secondly, the existence of criminal agency as its cause.

The death must be proved by direct testimony, or by presumptive evidence of the strongest kind, and the criminal agency may then be established by presumptive reasoning upon all the facts and circumstances of the case.

When the dead body or remains have been discovered and identified, and the immediate cause of death remains unknown, the sworn observations and opinions of physicians, surgeons, chemists, and other scientific persons who have examined the body or remains, are often of the greatest value as testimony explaining the means of death.

Facts ascertained by reason of a confession may be considered in establishing the *corpus delicti;* but a confession not made in open court, or before the examining magistrate, but to an individual, uncorroborated by circumstances, and without proof, *aliunde*, that a crime has been committed, will not justify conviction; but the *corpus delicti* must be proved independently of extra-judicial confessions, and beyond reasonable doubt; and without such proof of the *corpus delicti*, evidence of the confession is inadmissible at the trial. Stringfellow v. the State, 26 Miss. R., 157, cited and approved.

Where a person of generally good health dies suddenly, and the symptoms and appearances indicate narcotic poison of Jamestown weed or *stramonium*, but are similar also to symptoms common to disease of the heart, or congestion of the brain or stomach, and the testimony and opinions of several physicians who examined the stomach and contents, without any analysis, is conflicting and leave it in doubt, with the probabilities equally balanced, whether the deceased died of poison or of disease—these facts, though accompanied by proof of a confession of the accused that he had administered Jamestown weed, are not sufficient to warrant conviction.

Circumstantial evidence should be acted upon with great caution, especially where the public anxiety for the detection of a great crime creates an unusual tendency to exaggerate facts and draw rash inferences.

Error to the Copiah circuit court.　McNAIR, J.

The facts are sufficiently stated in the opinion of the court, except the testimony of the witnesses relating to the confessions of the prisoner.

William Kennedy, a witness for the state, testified that he was a prisoner in jail, in the same room with the prisoner John Pitts, but in a different cage. Heard and saw Mr. Geo. Magee, Mr. Joseph Magee, Mr. Zachary, and several others, talking to the prisoner. Saw two of the deputy-sheriffs there—Mr. Brady and Mr. Cochran. The prisoner denied that he poisoned the deceased James Magee, or had anything to do with his death. After they went away the prisoner laid down and seemed to be asleep. He commenced groaning in his sleep, and I said to him, " Halloa, old fellow ! what's the matter ? " and he answered that Patsy Allen was down stairs, there, telling on him, and making it out that she had nothing to do with it, when she was as much to blame as he was ; and that he told him that James Magee was too intimate with his wife ; that he was going to shoot him, and Patsy Allen told him not to do it ; that he would be hung ; that she could tell him how to do it, and what to give him, and if he would give it to her she would give it to James Magee ; and that he got Jamestown weed and beat it up and gave it to Patsy Allen, and that she told him afterward that she had given it to him by putting it in the molasses." This statement was made voluntarily on the part of the prisoner. After he made this statement, he said if I would call the white people, he would tell them all about it. I called them, and Mr. Magee came up.

Mr. Joseph Magee being sworn, testified, among other things, " The prisoner confessed to me in jail that he gave it to Patsy Allen to give to James Magee ; that one Sugar Bill Allen, a freedman, told him how to prepare it ; did not know where Sugar Bill Allen was ; when he heard from him he was in Madison county."

This was a voluntary statement on the part of the prisoner, made after he had confessed to Wm. Kennedy.

The following errors are assigned on the part of the plaintiff in error:

1st. The court below erred in overruling the motion to quash the special *venire facias* on the causes assigned and the testimony in support thereof.

2d. And it was also error because the record does not show that the assessor delivered a list of the names of all the persons in said Copiah county, qualified to serve as jurors, to the clerk of the circuit court of said county, nor that said clerk transcribed the same in a book kept for that purpose, as the law requires.

3d. And because the record does not show that the special *venire facias* was drawn from "jury-box No. 1," out of which the regular jury for each term of said circuit court of said Copiah county is required to be drawn, according to the statute in such cases made and provided.

4th. And also, because the record does not show that the names on the slips of paper in the pretended jury-box, from which the pretended drawing of the special *venire facias* was had, were, or had been, transcribed in a book kept for that purpose, by the clerk of said circuit court, from any list delivered to him by the assessor of said county.

5th. And because the record does not show that the list of names or any list of names of persons delivered to said clerk by said assessor included or embraced all persons of the county qualified to serve as jurors, without regard to race, color, or previous condition in life, according to law and the act of Congress in such cases made and provided.

6th. There is manifest error in the record, because it does not show that the indictment was returned into open court by the foreman in the presence of at least twelve of the grand jurors.

7th. Because the court below erred in not sustaining the motion for a new trial.

8th. And it was also error to pronounce judgment when the record shows no severance or disposition of Patsy Allen.

9th. It was error to pronounce judgment when the *corpus delicti* was not proved.

10th. And that in the proceedings, record, ruling on motions,

and in rendering judgment thereon, there are many and manifest errors besides those specified.

*S. J. Morehead,* for plaintiff in error.

It is insisted for the plaintiff in error that the *corpus delicti* was not established in this case, and that unless it be established, there could be no valid conviction. The proposition in the case of Sam v. The State, 33 Miss., that the main fact to be established as the basis of the prosecution was, that the house had been burned, is not sustained by subsequent decisions, and if it were, it is submitted that it does not militate against the case at bar; because all houses are not burned, but all men die; and that, therefore, it is not sufficient to say in this case that the main fact to be established as the basis of the prosecution was that James Magee was dead. But it must be established that he came to his death *feloniously.* It does not appear that it has ever been expressly decided that the naked confession alone was sufficient to authorize a *jury to convict.* 26 Miss. R., 165, 166; 5 Halstead, N. J., 163–185; Haywood, 455–524; 1 Greenl. Ev., §§ 217–219, 220, and note 6; 222 and note 1. And that he came to his death feloniously must be established by testimony *independent* of confessions. Stringfellow v. The State, 26 Miss., 165, 266. And the evidence ought to be *strong* and *cogent.* 3 Greenl. Ev., last part of § 30; Rex v. Benditt, 4 B. & Ald., 123.

"The books furnish many deplorable instances of the conviction and execution of innocent persons, for the want of sufficiently certain proof of the *corpus delicti.*" Wharton's Am. Crim. Law, 284, 285, 2d ed. The only testimony, independent of confessions, pretending to show the *corpus delicti,* was Dr. Peets', and that is too contradictory and confused to be considered either "clear or cogent." As the record shows, Dr. Peets found deceased in a comatose and sinking condition, and gave him five grains of quinine to arouse him. He testified that that was a small dose in such a case, and that thirty or forty grains would be a large dose. He also testified that the same symptoms would be present in diseases of the heart, and in congestions of the brain and stomach, as were present in deceased. He

further testified that there would be delirium and spasmodic affections from the effects of narcotic poison, but did not say that deceased had either; but on the contrary, Pomp Newell testified that deceased did not seem convulsed or delirious, and that he thought he was asleep. The testimony of all the physicians agrees in this, that the early effects of narcotic poison is a delirious or spasmodic state; and Dr. Hanslow testifies that when the dose is large, that state passes off sooner.

Now, if he ate but little, was in fine spirits, went to the party, was dancing the third set, and was taken suddenly in the midst of the dance and its excitement, in a crowded room, with a pine-knot fire large enough to light it, beyond all contradiction, he could not have had a large dose. It must have been small. According to Dr. Hanslow, the spasms and delirium must have been long in passing off, and according to the testimony of Dr. Peets, he must have had convulsions and been delirious, if poisoned with a narcotic poison. And thus the testimony of Pomp Newell, that he was not delirious or convulsed in any way, is corroborated. And it is submitted that this view of the testimony shows that he could not have been poisoned. Because, in either aspect of the testimony, that if the dose was small, the delirium or convulsions must have lasted long, or if large, it would have been quick, short, and decisive in passing off.

There seems to be no evidence in the record that the offense was committed within the county of Copiah, as alleged in the indictment. State v. Green, 23 Miss., 513; State v. Vaughn, 3 S. & M., 553.

We look, in the next place, into the confessions. All the circumstances, in the midst of which they were wrung from the defendant, ought to be considered. The status of the races was at the time great with uncertainty. Though the temper was not bad, yet the public mind was full of distrust and incredulity. An officer and a posse came upon the defendant, a very weak and ignorant negro, in a deep sleep, in the dead of night, aroused, arrested, and traveled him till midnight to Joseph Magee's; thence, next morning, to the court-house, where, as is usual on such arrivals, a large concourse of people ran together, surrounding him, questioning him, and following him, when he

is presently taken to jail, where he is told to tell the truth.
Henry Cochran, a deputy sheriff, told him it would be better
for him to tell the truth. And having just testified the same
thing in Patsy Allen's case, and perceiving that that was not
sufficient to convict (1 Greenl. Ev., p. 304, §§ 219, 220, and note
6, § 222), immediately added that he (defendant) could not go to
heaven with a lie in his mouth. But the mischief was already
done by the first remark. The impression had been made upon
the very weak mind of the negro that it would be better for him
to confess, guilty or not guilty; and laboring under a general
uncertainty and distrust of mind, already uneasy and alarmed
by the night arrest, the talk and whisperings of the party, the
night march, the early morning march to the court-house, being
suddenly surrounded by a large crowd, hurried off, in the midst
of the crowd, to jail—in the midst of these new, unusual, and
overawing circumstances, was utterly unfitted to make up a safe
judgment as to what was best for him to do; was just in that
state of overwhelmed feeling that would induce one so ignorant
and weak to seize the suggestions of any one making them with
apparent kindness. The inducements, once having a lodgment
in the mind, continue. 2 Russ. Cr., 839–842; 32 Miss., 386;
36 Miss., 116. Under all the circumstances as shown by the
testimony, it is submitted that the confession should not have
gone to the jury, and that as they did, denials as well as admis-
sions, they were not sufficient to authorize a conviction. 1
Greenl. Ev., § 214, and cases cited in note 2, on false confes-
sions.

It is insisted that the motion in arrest of judgment ought to
have been sustained. The record shows an arraignment at a
former term, but is not sustained by any legal arraignment of
any former term. The record only states that there was an ar-
raignment, but does not set out the arraignment. 8 S. & M.,
587–595. Independent of the bill of indictment, and outside of
it, the record should show that defendant was indicted by a
grand jury of lawful men of the county, duly elected, examined,
empaneled, and sworn. The record should show that defendant
was *continuously* present throughout the trial. It only shows
that he was brought into court; it does not show that he was so

conditioned or located as that he could confront the state's wit-
nesses, or see the jury, or was in their presence; nor whether he
was brought in when the jury was, or remained in court during
the trial, 8 S. & M., 722. The record should also show that
the indictment was returned into open court in the presence of
at least twelve of the grand jurors, by their foreman. Rev.
Code, 614, art. 257. The record should show that such indict-
ment was entered or marked " filed," and such entry dated and
signed by the clerk. Same page and article of Code. It will
not do to say that such entry made on the minutes would do,
for the next article, 258, forbids it. The record comes short of
all these requirements, and, therefore, the motion in arrest of
judgment ought to have been sustained. Dyson v. The State,
26 Miss., 383.

The court cannot determine, in capital cases, when the special
*venire* is being drawn, who shall be a juror and who shall not,
of the names of those persons on the slips of paper drawn.
The statute does not authorize it, as in drawing the petit
jury. Rev. Code, 500, Art. 157, and Art. 295, p. 620. Nor
could the court delegate the power to the sheriff; and yet Sheriff
Lowe testifies that, under the direction of the court, he dropped,
or threw aside, all such as *he knew* to be non-residents, school-
teachers, or incompetent; and that he threw out the name of F.
W. Fanning, because he was supposed not to be in the county;
all transient persons (in his judgment); all names of persons
drawn on the slips whom he did not know to be residents of
said county. It is denied that any such power was conferred
upon the courts. But if it had been conferred upon the court
in capital cases, the court could not delegate it to the sheriff, to
determine the competency or incompetency, residence or non-
residence, of jurors as drawn from the box, whether they should,
in his opinion, be set aside, or put upon a special *venire facias*,
to try a man for his life.

It is insisted that there has been no drawing, but a taking or
selecting of slips from the box, and that the names could be
read before drawn, and is no drawing within the meaning of the
statute.

*J. S. Morris,* attorney general.

1st. The court below very properly refused to quash the special *venire facias* for any or all the causes alleged. Sumrall et al. v. The State, 29 Miss., 202; Rev. Code, p. 501, art. 141; p. 613, art. 250; Wharton's Cr. Law, 6th ed., § 3216, and authorities there cited.

2d. The record shows that the indictment was returned into open court by " the grand jurors elected, empaneled, sworn and charged," &c., "through their foreman, John Dunning," and " in presence of all the grand jurors." It is not alleged, either in the assignment of errors or argument of counsel, that the grand jury was in fact composed of less than fifteen persons, the number required by law. It must, therefore, be presumed that the grand jury was complete, and that the indictment was in fact " presented to the court by at least twelve of such jury, including the foreman." See Revised Code, p. 610, art. 257; Whar. Cr. L., 6th ed., § 500.

3d. The record does distinctly state that there was a severance for trial of the plaintiff in error and his co-defendant, Patsy Allen.

4th. That the proof of the *corpus delicti* is sufficiently established, see Whar. Cr. L., § 745; Stark. Ev., 3d. ed., § 5; People v. Ruloff, 3 Parker's C. R. (N. Y.), 401; Whar. & Stille's Med. Jur., § 1092.

PEYTON, C. J.:

At the October term, 1868, of the circuit court of Copiah county, the plaintiff in error was tried and convicted of the murder of James Magee, and sentenced by the court to be hung, and from this judgment of the court he prosecutes here this writ of error.

The main question presented by the record in this case for our consideration is, Was the *corpus delicti* sufficiently established by the evidence on the trial in the court below to justify the conviction of the accused? In order to arrive at a correct conclusion, it is necessary to understand, in the first instance, what is meant by the terms *corpus delicti,* or, in other words, the body of the offense charged. The *corpus delicti* is made up

of two things: First, certain facts forming its basis; and sec-ondly, the existence of criminal agency as the cause of them. In a case of felonious homicide, it consists. of two substantial fundamental facts: 1st. The fact of the death of the deceased; and 2d. The fact of the existence of criminal agency as the cause of the death. The first of these constituents is always required to be proved either by direct testimony or by presumptive evidence of the strongest kind. And the second of these constituents becomes a proper subject of presumptive reasoning upon all the facts and circumstances of the case. A dead body, or its remains, having been discovered and identified as that of the person charged to have been killed, and the basis of the *corpus delicti* being thus fully established, the next step in the process, and the one which serves to complete the proof of that indispensable preliminary fact, is to show that the death has been occasioned by the criminal act or agency of another person. This may always be done by means of circumstantial evidence. All the facts and circumstances of the case may be taken into consideration.

Prominent among the testimony necessarily made use of at this stage of investigation is that of medical and scientific persons, surgeons, physicians, and chemists, by whom the body or its remains have been inspected and examined, either at the time of their discovery or shortly after. The testimony of these witnesses as to the appearances observed on such examinations is always of the greatest value, and their opinions as to the causes of such appearances are entitled to much consideration. Facts ascertained by reason of a prisoner's confession may be taken into consideration in establishing the *corpus delicti*. But the confession of a party not made in open court, or on examination before a magistrate, but to an individual, uncorroborated by circumstances, and without proof *aliunde* that a crime had been committed, will not justify a conviction. The *corpus delicti* must be proved beyond a reasonable doubt by evidence other than such extrajudicial confessions. Robinson v. State, 12 Mo., 592; State v. Scott, 39 Mo., 424. If there be no evidence that a crime has been committed, it is improper to admit upon

the trial, evidence of the confession of the accused.[1]  The State v. Laliger, 4 Minn., 368.

In the important case of Stringfellow v. The State, 26 Miss., 157 and 165, the authorities upon this subject have been reviewed at considerable length by the court, who came to the conclusion, after great deliberation, that the doctrine which holds that in capital felonies the prisoner's confession, when the *corpus delicti* is not proved by independent testimony, is insufficient for his conviction, best accords with the solid principles of reason, and the caution which should be applied in the admission and estimate of this species of evidence; and that the extrajudicial confession of a prisoner, without proof *aliunde* of the commission of a felony, was insufficient to warrant his conviction.

Greenleaf, in the 1st volume, section 217, of his very valuable treatise on evidence, says: " Whether *extrajudicial confessions*, uncorroborated by other proof of the *corpus delicti*, are of themselves sufficient to found a conviction of the prisoner, has recently been gravely doubted in England.  But in the United States the prisoner's confession, when the *corpus delicti* is not otherwise proved, has been held insufficient for his conviction, and this opinion best accords with the humanity of the criminal code, and with the great degree of caution applied in receiving and weighing the evidence of confessions in other cases, and it seems to be countenanced by approved writers on this branch of the law."  Wills, in his valuable treatise on circumstantial evidence, 39 Law Library, page 88, says: "It may be doubted whether justice and policy ever sanction conviction where there is no other proof of the *corpus delicti* than the uncorroborated confession of the party."  And Wharton, in section 683 of the 1st volume of his criminal law, says: " In this country there is a growing unwillingness to rest convictions on confessions alone."  In Illinois and New York it is held that a naked confession, unattended with circumstances, is not sufficient to sustain a conviction of the accused, unless such confession be judicial or in open court.   Bergen v. The People, 17 Illinois, 427, and The People v. Rulloff, 3 Parker's Cr. R., 401.

[1] See authorities cited in note to Stringfellow's case, *supra*, where the question is thoroughly discussed, and all the important cases cited in note thereto.

We think the well-considered case above cited, of Stringfellow v. The State, announces the correct doctrine upon the subject of the extrajudicial confessions of the accused in capital felonies. We think the doctrine of that case, which holds that in capital felonies the prisoner's extrajudicial confession when the *corpus delicti* is not proved by independent testimony, is insufficient to warrant his conviction, is sustained by authority, and best accords with the principles of reason, justice, and policy.

In the case at bar, the jury must have founded their verdict upon the confessions of the accused; for independently of those confessions there was no evidence to establish the existence of any criminal agency of the accused in the production of the death of the deceased. Dr. Peets, the only witness who testified that the deceased came to his death by poison, does not implicate the accused in the supposed poisoning of the deceased, nor is there any testimony in the record, *aliunde* his confessions, that tends to show that the accused had any agency in procuring the death of the deceased; and the prosecution having thus wholly failed to prove the *corpus delicti* by evidence other than the confessions, the verdict was unsupported by evidence, and the conviction was therefore wrong, and cannot be sustained.

But even suppose the *corpus delicti* had been established, by reference to the testimony it will appear that the prosecution failed to make out such a case as would justify the conviction of the accused.

Dr. Peets, who was the first physician called to the deceased, testified that he thought that he had congestion, either of the brain or stomach, and actually treated the case as one of congestion, but afterward came to the conclusion that he was poisoned, and died from the effects of the narcotic poison of the Jamestown weed or stramonium; stated that similar symptoms in the disease of the heart, and congestion of the brain or stomach, would be produced as he found in the case of the deceased, such as cold sweat, cold extremities, loss of the use of the limbs, headache, vomiting, and slow, full, and intermittent pulse. He further testified that a person in apparent good health is liable to attacks of disease of the heart and congestion of the brain or stomach as other persons; and that persons dancing in a warm

room, or from any uncommon exercise, are liable to such attacks. Many cases are reported in which persons were stricken suddenly, as above stated, when dancing; that dilation of the pupil of the eye would occur from congestion or disease of the heart as well as from the effects of narcotic poison. Witness could not state from his professional knowledge that the deceased came to his death from the effects of poison; thought, however, that he was poisoned; said that delirium and spasms would follow from the effects of narcotic poison, such as Jamestown weed or stramonium.

Pomp Newell testified, on the part of the state, that on the night before James Magee's death, he had a party and dancing at his house; saw the deceased dance two or three times; the room they danced in was a log-house, about sixteen by eighteen feet in size. The house was well lighted by a large pine-knot fire in the fire-place, and had no other light; there was a crowd in the room; that the deceased, after he was taken sick, did not seem convulsed or delirious in any way, but lay quiet on the bed as though he was asleep.

Dr. Hanslow testified that he was a practicing physician and regular graduate; had had a good deal of experience in the effects of poisons; had heard the testimony of Dr. Peets; states that persons having congestion of the stomach or brain, and in diseases of the heart where death ensues, would present similar symptoms to those described by Dr. Peets as exhibited by the deceased when he saw him in his last illness. Persons in apparent good health are liable to such attacks; persons dancing in a warm room, or having taken any unusual exercise, are liable to such attacks. Symptoms in congestion of the brain or stomach, would be cold sweat, cold extremities, loss of the use of limbs, slow, full, and intermittent pulse, and dilation of the pupil of the eye. Witness further testified, that from the testimony of Dr. Peets, and from all the testimony he had heard, he must say, from his professional knowledge, that it would have been impossible for him to have told what was the matter with the deceased, if he had been present with him. Dr. Purnell was next sworn, who testified substantially the same as Dr. Hanslow did.

Dr. Durr testified that he saw the body of the deceased some nine or ten days after it had been buried, when it was disinterred; that he opened the body and took out the stomach, but made no analysis of its contents; saw no evidence of poison in or about the body or stomach.

The symptoms produced by stramonium are intoxication, delirium, loss of sense, drowsiness, a sort of madness and fury, loss of memory, convulsions, paralysis of the limbs, cold sweats, and excessive thirst and trembling. 2 Beck's Medical Jurisprudence, 867. And Dr. Peets testifies that delirium and spasms would follow from the effects of narcotic poison, such as Jamestown weed or stramonium.

There is no evidence that the deceased had any of the prominent characteristic symptoms produced by stramonium, such as delirium, spasms and convulsions. He had, however, other symptoms, which are common to both congestion and narcotic poison. He had been dancing some time in a small, crowded room, lighted up by the hot fire produced by pine knots, which must necessarily have made the room quite warm and disagreeable. Under such circumstances, the physicians, Peets, Hanslow, and Purnell, agree that he might have been suddenly stricken down by congestion, for which he was treated by Peets, when first called in to attend him, and the symptoms of which disease the said physicians all agree that he had. And from all the evidence in the cause, we are led to infer that the disease first changed its character from congestion to poison, from the confessions of the accused, which from the atrocious nature of the crime of poison, was well calculated to excite in the public mind a feeling of just indignation, and a desire to ferret out, and punish the guily agent. And in this connection, it may not be improper here to observe, that circumstantial evidence ought to be acted on with great caution, especially where an anxiety is naturally felt for the detection of great crimes. This anxiety often leads witnesses to mistake or exaggerate facts, and juries to draw rash inferences. Not unfrequently a presumption is formed from circumstances which would not have been noticed as a ground of crimination but for the accusation itself, and in this instance, the confessions.

From the evidence of the medical witnesses, it was just as reasonable to suppose that the deceased came to his death from natural causes as from the effects of poison. As we have seen, he had all the symptoms, and may have died of congestion of the brain or stomach. And if so, the conviction, even upon this ground, is of more than doubtful propriety, and cannot be sustained upon any principle of humanity or of sound law. For it is the exclusion of every other reasonable hypothesis than that of the guilt of the accused, that invests mere circumstances with the force of proof.

For the reasons herein stated, the judgment of the court below must be reversed and the cause remanded.