## Ward v. State.

[78 South. 782, In Banc.]

Criminal Law. *Appeal. Prejudicial error. Confession.*

Where in a prosecution for arson the only evidence tending to show defendant's guilt was his tracing by blood hounds and certain corroborative evidence that when arrested he had on moccasin shoes which fitted the tracks found at the scene of the crime. In such case a conviction will be reversed because of the admission in evidence of a confession extorted from the defendant by terrorism and threats of immediate death, although the court, when this fact was discovered, excluded the confession and told the jury to disregard it.

Appeal from the circuit court of Lowndes county.
Hon. T. B. Carroll, Judge.

Jim Ward was convicted of arson and appeals.

The facts are fully stated in the opinion of the court.

*W. B. Stribling,* for appellant.

There were tracks of a human being seventy-five to one hundred yards from barn burned, but Cocke testified a number of negroes lived on his plantation that wore shoes ranging in number from eight to ten, and the kind of shoes of the track found, yet, it is contended that they were appellant's tracks.

This was all the evidence that appellee had in the lower court to obtain a conviction, which appellant claims is not sufficient to warrant same. It is assumed that the jury in rendering their verdict of guilty were affected by the outside consideration of the wealthy planters of the neighborhood where the barn was burned, that they would heartily approve of their decision. See *Barker* v. *State*, 76 So. 676. There was no threats shown that appellant was going to burn the barn, or any ill will existing between the appellant and the

owner of the barn, and if there had been, then the evidence would have been at most only suspicion and insufficient to support a conviction, which the court has held in *Strong* v. *State,* 43 Miss. 392; *Luker* v. *State,* 14 So. 259, the court held: 'That tracks about the size of defendant's were found around the pen, and followed to, and some way along the road leading to defendant's house, is insufficient to convict. See, also, *Bloden* v. *State,* 54 So. 241; *Spears* v. *State,* 92 Miss. 613, 46 So. 166, 16 L. R. A. (N. S.) 285; *Scott* v. *State,* 66 So. 973; *Carter* v. *State* 64 So. 215, 50 L. R. A. (N. S.) 1112.

Appellee contends that the motive which prompted appellant to burn the barn was the forbidding by Cocke to permit appellant to hunt squirrels on his plantation, which appellant did not know was posted at the time, and when notified, readily agreed not to do so again. See evidence of Cocke, Trans. of Rec., pg. 17, No. 2, and evidence of appellant Trans. of Rec., pg. 90; however, motive alone is not proof of crime. See *Luker* v. *State,* 14 So. 529.

When appellant was taken by the officer hand-cuffed in the neightborhood where the fire occurred, to the preliminary trial, a crowd of white citizens had assembled, and they took him in the barn where the trial was to be held and threatened to take his life if he did not confess to the crime, which he did to save his life and prevent personal violence, which happened a few minutes before the arrival of Hardy on the scene.

The court below correctly ruled this confession out made to Hardy and Evans and their testimony, but the poison had already been injected into the minds of the jury and a conviction had, which was desired by appellee, regardless of the law and the evidence, and for this reason many negroes, whose labor is much needed here, are leaving the state because they are unable to obtain a fair and impartial trial in the

lower courts, and few are financially able to appeal to the higher courts to receive justice.

Why did the dogs first go to the home of Pete Dillards, in the house and on the bed? Did he wear the same size and kind of shoe of the track found, and did the heel of the shoe have tacks therein? Did the dogs ever come in contact with Pete Dillard to see if they would recognize him? Why was he not arrested and charged with this crime? Was it because he was a tenant on the Cocke plantation and to do so would cause dissatisfaction and disturbance among the other tenants on said place. Is it not possible the barn was struck by lightening that caused the fire? It is probable, as other buildings in the same neighborhood in the past year had been set on fire this way and burned.

But appellant is not required to prove how the fire originated, but it is incumbent upon appellee to prove appellant's guilt of the crime charged beyond a reasonable doubt and to a moral certainty, which we conscientiously believe appellee has failed to do, and confidently ask a reversal of this cause.

*Ross A. Collins*, Attorney-General, for the state.

I think the court was in error in excluding the testimony of Mr. Hardy as to the confession of the appellant merely because another confession made to Mr. Evans was made under duress. This action of the court took from the jury some very material testimony for the state.

I think the error assigned as to criminal agency not being shown cannot be maintained. The facts and circumstances are sufficient to show the criminal agency. *Spears* v. *State*, 92 Miss. 613, 46 So. 166.

As to whether the testimony after the exclusion of the confession is sufficient to sustain the verdict of the jury, I submit to the court on the record without argument.

COOK, P. J., delivered the opinion of the court.

The grand jury of Lowndes county returned an indictment against appellant charging him with arson, and the petit jury rendered their verdict of guilty as charged. The defendant appeals to this court.

The evidence submitted to the jury was about as follows: Somewhere near midnight the barn of C. H. Cocke was burned. The evidence discloses that the night was dark and threatening rain; there was considerable lightning, but it appears from the testimony of the witnesses nearest to the scene that the storm cloud was in the distance, and according to these witnesses there was no indication that the barn was struck by lightning, but that the fire was started by some criminal agency. The statement of these witnesses about the origin of the fire, no doubt, carried conviction to the minds of the jury. If honest, their evidence strongly discredits the theory that lightning caused the fire. About midnight, Mr. Harris, the manager of the plantation, was awakened by the barking and "lunging" of a setter dog near his sleeping quarters, when he discovered that the barn was on fire, and immediately aroused the owner.

These two witnesses testified that the indications were that the fire originated in the northeast corner of an old log crib, which adjoined the barn. A lot of shucks were in the crib. The crib was fenced off from the barn, and the approaches to the barn usually in use were all to the west and south. Suspecting incendiarism, the owner and his manager took precautions to prevent anybody from passing around the barn and the crib where they believed the fire had originated. So they at once telegraphed for trained bloodhounds having a reputation for truth and veracity. These hounds were in the control of an experienced man. About twelve hours after the fire was discovered, the hounds were taken to the rear of the crib, where Mr. Cocke and Mr.

Harris believed, from the indications, the fire originat-
ed. The dogs were taken over a circle and immediately
picked up a trail near where it was believed the fire
was started, and trailed to a freshly plowed cornfield,
where was found a track made by a "moccasin shoe
or an old piece of a shoe," with nail points at the
heel, and it also appeared that the person who made
the track was running. It also appears that a shower
had fallen about the time the barn had finished burning,
and it also appeared that the rain had fallen on the
track the dogs were running. In other words, the
rain came after the track was made in the mud.

The trail was followed through the field and to the
public road, and along the road for some distance, when
the dogs turned from the road and went to a cabin
occupied by a negro named Pete Dillard. The dogs
went up on the porch and into the house, but came out,
and were taken to the end of the porch, and continued
trailing from there in a "devious course" through the
pasture and cornfield and back to the public road, where
was found a moccasin track in the soft ground, which
the witness said was the same track the dogs had
started with. Without going into all the details of the
chase, the evidence discloses that the dogs carried the
trail to the house of the defendant, and in their way
pointed out the defendant as the man they had trailed
from the scene of the crime.

It appears that the defendant had been plowing in
a field near his home the morning after the fire, and
when this was ascertained the trainer of the dogs took
the dogs to the field, and they soon picked up a trail of
a man who was wearing a moccasin similar to the one
made near the scene of the crime. This trail was
followed to a place where it was lost or ended, and it
was evident that then the man who made the track at this
point mounted his mule. So far as the testimony of the
dogs is concerned, it may be said that is was fairly

complete, and was corroborated by the defendant him-
self, as we will presently show.

In addition to the testimony of the dogs, the evidence
shows that a short time before the burning of the
barn Mr. Cocke had learned that the defendant had been
hunting on his land, and when Mr. Cocke accused him
of it he admitted the charge, but said that he did not
know that Mr. Cocke objected, and would not do so
again. There is some evidence to indicate that the
defendant resented Mr. Cocke's interference with the
defendant's hunting privileges.

This is about all of the evidence tending to prove the
defendant guilty of the crime charged against him,
except an alleged voluntary confession. The confession
was related by a citizen of high character, and it is
admitted that the defendant did so confess, but after
this confession had been related to the jury, it was
made clear to the court that it was not free and
voluntary, but on the contrary it clearly appears that
the so-called confession had been extorted from him by
terrorism and threats of immediate death. In that
state of the record the court excluded the testimony,
and admonished the jury not to consider it at all. It
will be remembered that aside from the confession, the
state was dependent upon the evidence of the dogs and
the circumstances corroborating same.

Let us now consider the corroborating evidence. It
appears that the defendant, when he was arrested, had
on moccasin shoes; that his shoes filled the tracks; that
the tacks in his shoes filled the impression in the mud
near the barn. Again, there was the evidence of a
motive, trivial as it may be to a normal man, but it
must be remembered that criminals are not normal.
Conceding, for the purposes of this opinion, that there
was enough evidence upon which to base the verdict
of the jury, exclusive of the confession, does it follow
that the judgment below must be affirmed? It will be
recalled that the dogs trailed to Pete Dillard's cabin, and

from that to the defendant's house. This, we think, is significant, because the defendant, in his alleged confession, admitted that after he had burned the barn he went to Pete Dillard's cabin, and went upon the gallery for the purpose of turning suspicion from himself. The jury heard this statement confirming in a striking way the testimony of the hounds. The judge did his duty when he told the jury not to consider the confession, and theoretically the jury obeyed the instructions of the court.

This is a very close case, to say the least, with the confession eliminated, and may we say with confidence that untrained juries were able to dismiss from their minds that part of the confession which so strikingly confirmed the accuracy and reliability of the dog testimony? Trained lawyers are schooled to put aside all incompetent testimony and consider alone the competent evidence, unaffected by evidence which experience and training has taught them has no probative value. Can the layman do the same? We fear not. No doubt, the gentlemen who put the defendant through the "third degree" had all their lingering doubts removed by the so-called confession, and the jury was composed of the same kind of men. It is the opinion of the writer that the average juror has but scant respect for what he terms the "hair-splitting theories of lawyers." We are of opinion that through no fault of the trial judge this defendant did not receive that fair and impartial trial which our law should accord to the humblest of our population.

This case will be reversed for a retrial of the defendant by a jury whose minds are not warped by incompetent evidence so damaging to the accused.

*Reversed.*

SMITH, C. J., and SYKES, J., dissent.

ETHRIDGE, J. (concurring). I concur in the reversal of this case on the ground set forth in the majority

opinion; and it is manifest that the harm resulting from the admission of this unlawful confession could not, on the facts in this case, be cured by instructing the jury to disregard such confession. With the confession eliminated there was nothing left to secure a conviction except circumstantial evidence, and this was not, in my opinion, strong enough to exclude every reasonable hypothesis except guilt. The rule governing the sufficiency of circumstantial evidence is well stated in *Algheri* v. *State,* 25 Miss. 584, 1 Morris' State Cases, 658, as follows:

"In the application of circumstantial evidence to the determination of a case, the utmost caution and vigilance should be used. It is always insufficient where, assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true; for it is the actual exclusion of every other hypothesis which invests mere circumstances with the force of truth. Where the evidence leaves it indifferent which of several hypotheses is true, or establishes only some finite probability in favor of one hypothesis, such evidence cannot amount to proof, however great the probability may be."

Applying this rule to the facts in this case, the proof is wholly insufficient to establish either: First, the *corpus delicti;* or, second, the defendant's connection with the burning.

In my opinion the *corpus delicti* is not sufficiently established. *Pitts* v. *State,* 43 Miss. 472, 2 Morris' State Cases, 1655; *Stringfellow* v. *State,* 26 Miss. 157, 59 Am. Dec. 247; *Spears* v. *State,* 92 Miss. 613, 46 So. 166, 16 L. R. A. (N. S.) 185. It appears that the barn was burning and the fire was under good headway when it was first discovered by the owner and his employees. No person was seen near the barn, nor were any such circumstances in evidence as would show beyond reasonable doubt that the barn was set on fire by human agency. It appears from the evidence of numerous

witnesses in the case that there was a good deal of
lightning and thunder on the night of the burning, and
that several houses in the community had been destroy-
ed by being set on fire by lightning within recent times
to the knowledge of the witnesses. Under these circum-
stances it would appear probable that the barn was set.
on fire by lightning. There was certainly a reasonable
hypothesis that it could have been fired by this agency;
and the evidence should establish the *corpus delicti* to
the exclusion of every reasonable hypothesis where
there is no direct evidence of human agency in setting
fire to the barn.

Again, I do not think the evidence to connect the
defendant with the burning is sufficient to exclude every
reasonable hypothesis if we consider, for the sake of
argument, that the barn was burned by human agency.
*John* v. *State,* 24 Miss. 569, 1 Morris' State Cases, 608;
*Calebb* v. *State,* 39 Miss. 721, 2 Morris' State Cases,
1490; *Algheri* v. *State,* 25 Miss. 584, 1 Morris, State
Cases, 658. After the fire was discovered the parties
present made every effort to keep other persons away
from around the barn until bloodhounds could be
obtained. When the party owning the bloodhounds
appeared upon the scene he circled the barn with the
dogs, and they picked up the trail at some little dis-
tance from the barn, and pursued the trail to the house
of one Dillard, a negro living upon the premises of the
owner of the barn. The dogs trailed the tracks onto the
gallery and to the door, and stopped and when the
door opened and the dogs went on the inside, smelled
around the house on the inside, and, to use the language
of one of the witnesses, "appeared to be satisfied."
Thereupon the parties in charge of the dogs questioned
a little negro, being a son of Jim Dillard, and he
stated that in the night he heard some party come upon
the gallery and go off the gallery at a certain corner.
The dogs were then taken outside of the house, and
circled the house, and took a track at a corner of the

gallery about where the little boy said the party went off of the gallery. There was no effort to have Jim Dillard brought in contact with the dogs to see whether they would recognize him, nor was his track examined, or his shoe measured, or anything done to negative any inference that he may have made the track that the dogs trailed from near the barn to his house. The dogs, when leaving Dillard's house, pursued or trailed until they reached the house of Ward. They trailed to the house, and into his house, and walked up to Ward, and smelled of him, and walked away, seeming, to use the language of the witness, ''to be satisfied.'' It does not appear that the dogs were trained in a manner to make any demonstration on finding the person they were trailing. The owner said they were trained so that they would usually go to the party and smell of him and appear satisfied, but would not bark at him, or make any effort to take hold of him.

It is exceedingly unsatisfactory to me to convict a man upon evidence that a dog trailed a track to his house, smelled of him, and looked satisfied without making any other demonstration. The testimony does not negative the idea that other persons than Ward could have committed the crime, if it was a crime under the proof; that is to say if there was any human agency in burning the barn. It does not appear conclusively to my mind that the dogs ran the same track all the way from the barn to the appellant's house. It would look to me like a dog well trained would have continued the track upon and across the gallery and into the yard and on wherever it may have gone. Just why the dogs would stop and leave the trail and go to the door and into the house (when, concededly, under the testimony, the party who crossed the gallery never entered the room at all), instead of keeping the track, is not apparent. Just why the dogs would ''look satisfied'' when reaching Dillard's house, and why that would not be accepted as evidence as well as when the looked

satisfied at Ward's house, is a little mysterious. It rather appears to my mind that the parties did not want. Dillard. He probably was a valuable plantation hand,. and it would be inconvenient to send him to the penitentiary, and for that reason no examination was. made of him, his tracks, or of his premises on the occasion in question.

Unless the state can materially strengthen its evidence on these points on a new trial, I think it would be a good opportunity. for the state to show magnanimity and enter a *nolle prosequi.* Ward is shown to have been a person of good reputation in his community and he made all the defenses that a man ordinarily can make—that is, by the evidence of a man's wife that he was at home on the occasion; the wife testifying positively that she waked up while it was thundering, and that her husband. was then in bed. The time of the thundering shown by other witnesses would make it impossible for Ward to burn the barn and reach home and be in bed at that time. After a consideration of the facts in the record, three of the judges of this court are of opinion that the facts proven are insufficient to prove guilt, which, under the rules of circumstantial evidence, ought to be enough to show that there is a reasonable hypothesis other than guilt.

HOLDEN, J. (concurring). I concur generally in the majority opinion, and also concur specially in the reversal of the conviction, for the reason following:

Jim Ward was convicted of arson, and sentenced to serve a term of eight years in the state penitentiary. I think the lower court erred in granting instruction No. 1 to the state, which is as follows:

"The court charges the jury for the state, if they believe from the evidence in the case beyond a reasonable doubt that the defendant willfully and feloniously set fire to and burned the barn of C. H. Cocke, then he is guilty, and the jury should so find."

The error complained of in the instruction consists of the omission of "maliciously." As repeatedly held by this court, commencing in *Jesse* v. *State,* 28 Miss. 100, malice is of the essence of the crime of arson, and must be charged in the indictment, and proved by the state, and believed beyond a reasonable doubt by the jury before a conviction can be had. And this is true under both the common law and the statute. If the statute fails to prescribe and include this essential of arson by its language, the indictment, proof, and instructions must go further than the language of the statute, so as to include this vital ingredient of the crime. The rule holding that it is fatal and reversible error to fail to charge malice in the indictment and instructions to the jury on the trial is well considered and ably discussed by this court in the *Jesse Case, supra.* This rule of law requiring the charge of malice as an essential ingredient of the crime of arson has prevailed in our state since 1854, and has been repeatedly followed by this court since that time. In *Boone* v. *State,* 33 So. 172, this court, speaking through Chief Justice WHITFIELD, in a case identical with the one before us, said:

"The only charge given for the state omitted the word 'maliciously.' The case is a very close case on the facts, and the omission of this word, essential in a definition of arson, is fatal error."

I am constrained to follow the rule announced above, which has been recognized as the law repeatedly by this court. Especially do I think the rule should be applied in the case before us for the reason that the case is not only close on the facts, but the proof of guilt offered by the state in the court below is intrinsically weak, consisting of circumstantial evidence barely sufficient, if believed by a jury, to sustain a verdict of guilt. Further than this, in the trial below the jury had before it certain damaging testimony in the nature of confessions, which, although the court

attempted to exclude the confessions from the consideration of the jury by an instruction, still the poisonous effect of the alleged confessions had permeated the minds of the jury, and it was probably beyond the human power of the judge to eliminate it, by instruction, from their minds in considering their verdict in the case. The trial judge did all that lay within his power to have the jury disregard the testimony of the confessions of the accused, which were extorted by coercion and threats, by instructing the jury to disregard the testimony of the confessions, as soon as it appeared to him that the confessions of the defendant were incompetent and inadmissible; but under the circumstances and conditions surrounding the trial it appears to me that it was simply one of those rare cases where the court was powerless to correct the wrong that had been done the defendant by the incompetent testimony, and the only way that the injury could have been remedied would have been by trying the case with a new jury. The conviction was based upon circumstantial evidence alone, which, in my judgment, was so weak that I doubt whether or not a conviction would follow if the incompetent testimony is eliminated from the case.

Mr. Cocke's barn was discovered on fire at night, but no one was seen near it. The next day bloodhounds trailed and followed tracks which were discovered about seventy-five yards from the barn in a field. The dogs followed the trail and tracks to the house of one Dillard, a negro tenant on Mr. Cocke's place, and there stopped for a short time, and then went on to the house of the appellant, about three miles distant from the barn that was burned. There they went up to the appellant and stopped; appellant was arrested, and afterwards taken to the scene of the fire, and into a barn where a preliminary trial was to be had, and was there induced to confess the crime, as the record shows, by threats of several white men, with rope at hand, to

hang him and his wife before sundown if he did not "tell the truth" as to the burning of Mr. Cocke's barn. By this coercion a confession was extorted, which corroborated fully the circumstantial proof shown by the trailing of the bloodhounds.

A Mr. Evans sat by the district attorney in the prosecution of the case, and finally took the stand and testified to the confession made by appellant to him and others, and also stated the circumstances under which the confession was obtained; that is, that it was obtained by threats of violence to the appellant and his wife. When Mr. Evans testified to the extortion of the confession by threats it then appeared, for the first time to the court, that Mr. Hardy, a witness who had previously testified to the appellant's confession, had secured the confession (to Hardy) a very short while after the first confession was made to Mr. Evans under the threats of violence. When this state of the case appealed to the judge he very promptly and properly instructed the jury that the tesimony of Mr. Evans and Mr. Hardy as to the confessions was incompetent and should be disregarded by them. The court acted as soon as the fact was brought to his attention, and held that both confessions were tainted with threats and coercion, and therefore incompetent. But I think that the damage to the defendant had already been done when the minds of the jury became saturated with the poison of the confessions of the appellant, and, as I have said above, I hardly see how it was within the scope of human power to eliminate or eradicate the effect of this damaging testimony from the minds of the jury, and therefore the accused could get no fair and impartial trial under the circumstances with the jury then impaneled.

The proof offered by the state tended to show that the tracks found near the barn corresponded with the tracks of the appellant in size and shape, and that the shoes had certain tacks in the bottom of them that made

impressions in the earth and corresponded with the tracks found near the barn, and which when trailed led to the house of appellant.     However, the record shows that the same kind of "moccasin" shoes were commonly worn by other negroes in the same community.     No measure was taken of Dillard's tracks.     There was some thunder and lightning at the time the barn was ·discovered on fire.     The appellant bore reputation of being a peaceful and law-abiding citizen.     He proved .an *alibi* by his wife, the only witness he had.     There was a feeble effort on the part of the state to show a motive or malice on the part of the appellant, but we ·doubt whether the evidence was sufficient to conclusively show malice or motive, but it appears that this question was a disputed question for determination by the jury under proper instructions of the court, and therefore when the court failed to instruct the jury that the burning must have been maliciously done before a con-·viction could be had, the leaving out of this vital and ·essential ingredient of the crime becomes more im-portant, and emphasizes the error.

It appears to me that the district attorney probably ·ought to have known that the confessions made by the .appellant were incompetent testimony when he put the ¯witness Hardy upon the stand, because Mr. Evans, who sat by the district attorney, and apparently assisted in the prosecution, knew that the confessions had been obtained through threats and coercion, and that while Mr. Hardy obtained the confession he testified to a ·short time after the confession to Evans, without the ¯threats and coercion, still the district attorney ought to have known, if he had conferred with Evans, that the two confessions to Evans and Hardy were made so close together that both were vitally tainted with ·coercion, and were inadmissible.     I think the district attorney, who occupies an office, the high function of which is to administer public justice, should be re-·quired, when offering testimony of confessions, to

preliminarily show the competency of such testimony to the court by showing all the pertinent facts and circumstances at the time surrounding it when made, before he offers it, provided he knows of such facts and circumstances, or ought to know of them by reasonable diligence. This would have avoided the trouble, encountered by the court in this case.

I do not say that under rule 11 of this court I would not in a proper case regard as harmless the error of the court in omitting to charge the jury that they must believe the burning was done maliciously. Cases do arise where this court can look through the whole record and reasonably and safely conclude that such error was harmless because the proof of guilt is so abundant, and the result so manifestly right, that no other verdict could have been reached with, or without, the erroneous instruction. But the case before us now is not such a case, and I think the accused did not obtain a fair and impartial trial, as guaranteed by law, and that he should be granted a new trial.

*Reversed and remanded.*