### CALEB (A SLAVE) *v.* STATE, 39 Miss. R., 721.

#### HOMICIDE.

Not every improper or illegal act of the officer in charge of the jury, or of the jury themselves, will constitute just cause for setting aside the verdict. It must be shown that such improper conduct of the officer or jury exposed them to the exercise of improper influences. If this is not shown the verdict will not be disturbed.

As a general rule, a witness is not permitted to express his opinion upon a particular question, whether such question arise upon a fact stated, or a combination of facts admitted or proved; yet an exception to this rule extends to persons of skill on questions of skill, science, or trade. But this exception extends only to experts, and not to persons who are not shown to be experts in whatever scientific question that may be propounded to him.

A case of circumstantial evidence reviewed, and decided insufficient.

Error to Lowndes circuit court. HAMM, J.

The plaintiff in error was indicted in the court below for the murder of William Moore. The prisoner had, on a former trial, been convicted, and a new trial had been granted by this court. On the second trial the proof was substantially as follows:

The deceased, William Moore, was overseer for one William Kidd at the time he was killed, the 25th April, 1857, and had been during all that year, and for about six weeks of the latter part of the year 1856. He resided on his employer's plantation, in Lowndes county, with the slaves, there being no white person but him on the place. The residence and negro quarters on this plantation were all in the same inclosure, and were distant from the residence and quarters of H. Vaughan about six hundred yards, and from the residence of A. Kidd about one-half mile.

There were nine negro men on the place, besides women and

children. Moore had, during his employment, occasion to cor-
rect all these except the prisoner and two others. The last
time he corrected any of them was in February preceding.
Moore had a large cur-dog, which was much attached to him,
and constantly followed him whenever he went about the plan-
tation. Moore slept in a house on the plantation, which was
distant from the nearest negro-cabin only about ten paces, and
it was so situated that he could be seen through a window, when
sitting in his house, by the slaves lodging in the cabin. On Fri-
day night, April 25, 1857, Moore ate his supper as usual, and
was last seen, by several of the slaves occupying the nearest
cabin, sitting down in his house smoking his pipe. On the next
morning, one of the negro men, who was accustomed to make
a fire in Moore's house, went in for that purpose, and discov-
ered the door open, and the bed on which Moore slept undis-
turbed. Moore kept in his possession the key to the crib and
mule lot, and hence it was impossible for the negroes to go to
work with the mules, it being ploughing season, without the
key. His absence then became immediately known to all the
slaves on the place, many of whom, including the prisoner, com-
menced looking for tracks, to ascertain, as they said, in what
direction Moore had gone. Not finding any, the prisoner went
to A. Kidd, the master's son, and said to him, "That the shep-
herd is gone, and we are scattered." A. Kidd went over to
the quarter and got the mules, and put the negroes to work in
the field. Some of the neighbors were sent for to search for
Moore, but the search was unsuccessful on that day. On Sun-
day, about thirty of the neighbors continued the search, with all
the negroes about the place; and during the day the body was
discovered in a wood, distant about two hundred and forty
yards from the house. The body was within thirty paces of a
field which intervened between the house and the wood. The
wood where the body was found was not thick, the larger tim-
ber having been cut down and hauled away. The body was
not on any road or path through the wood, but was near an old
track which had been made by the wagons in hauling off the
timber. When Moore was found, he was lying on his breast
and belly, with his head in the direction of the field and house.

His arms were stretched out on the ground beyond his head, and his hands were clenched and joined together so tightly as to be separated with difficulty. The right side of his face and head were resting on his right arm. His boots were pulled off, and the leg of one of them was under his face and mouth. His right leg was extended at full length, and his left leg was drawn up and bent at the knee, and extended across the right leg. His clothes, which were the same he wore on Friday, were smooth. His pistol, which appeared to have been recently discharged, lay near enough to his right arm for him to have seized it had he been alive. A tin box of percussion caps was found under his body when he was turned over. This box had no top, but had paper or cloth over the caps to prevent them from getting lost from it. A single percussion cap was found lying on the ground near the body. There were no tracks near the body, nor was there any sign of a struggle. The deceased had in his pocket some keys and some small pieces of money. His vest and shirt were buttoned and smooth, and in the position they were worn. Upon examination, a wound was discovered under the vest and shirt, entering the body just below the breast-bone, and at the top of the pit of the stomach. This wound was one and a quarter of an inch long, and about half an inch wide. According to the testimony of some of the white witnesses, the wound was discovered as soon as the body was turned over; according to the testimony of others, it was only discoverable after removing to some extent the position of the vest and shirt. No blood whatever was discovered on his vest or clothes; but a very little blood—about two table-spoonfuls—was found on the ground under the wound, and a very little blood on the boot-leg, under his mouth. The body was in a state of putrefaction when it was discovered, and was offensive. Discolorations of the skin were found on the thighs, arms, and around the neck, which was swollen out even with the face. No *post mortem* examination was made, and no medical witness was examined to ascertain whether these discolorations were occasioned by bruises or injuries inflicted on the body during life, or whether they were occasioned by the settlement of the blood after death. All of the body was stiff except the neck. One

of the witnesses put a stick on the body near the wound, and upon pressing it, something like fat protruded from its mouth. It was stated by one of the witnesses that the wound was enlarged, and its shape altered, by pressing with this stick.

On Sunday, after the body was found, a coroner's inquest was held, and all the negroes on William Kidd's plantation were arrested, and confined, and examined separately, but no clue to the murder was discovered other than herein stated.

It was proven that the prisoner had a wife at Vaughan's, and that he had permission to visit her on the nights of Sunday, Wednesday, and Saturday; but it was shown that he frequently visited her on nights other than those permitted. It was shown by the testimony of several of the slaves on the place, that when they went to bed, about nine o'clock, prisoner was sitting in a chair asleep in the cabin nearest to Moore's house. This was not the house usually occupied by the prisoner. It was also shown by other slaves that, late in the night, prisoner came to the cabin which he usually occupied, and said he was going over to see his wife. It was proven by his wife that, after all the slaves on Vaughan's place (where she lived) had gone to bed, prisoner came to her house and woke her up, and then went to bed with her and stayed till daylight next morning. It was also proven by her that, on Wednesday, she had asked prisoner for a dollar to send to Columbus by her master on Saturday to buy a sifter and a pot, and that he promised to bring it on Friday night; and that when he got up on Saturday morning she asked him for the dollar, and he gave it to her. She stated that he left her house about daybreak; and it was proven by one or two slaves on William Kidd's place that prisoner reached home soon after light. The prisoner, upon being examined by the coroner's jury, stated that he had gone to Vaughan's on Friday night to see his wife, and carry her a dollar, according to his promise to her, to send to Columbus on Saturday by her master to buy a pot and sifter. It was also proven that Vaughan visited Columbus on Saturday. On the same examination he stated that he had not returned as early as usual on Saturday morning, because he was afraid, he having heard from the cook that a man had traveled the road

leading from Vaughan's to Kidd's quarter late Friday evening, making a *great noise*.

It was proven by Eliza, a slave (belonging to one Johnson), that she met prisoner on Sunday before Moore was killed, and asked him, "How he was getting along?" He replied, "Not at all." Witness asked what was the matter. He replied that "They had such a damned overseer." Witness asked him if the overseer had whipped him; and he said, "No; if he whipped him, he would kill him."

It was proven by Edy, a slave of W. Kidd's, and mother of Eliza, that she heard prisoner say on Friday morning (the day of the killing) that if Moore gave him the horn to blow, he would blow it at daybreak; and if he fooled with him, he would kill him. Witness said, "I hear you, Caleb; don't; if you do, I will tell master. He did not say anything. Yes, he said my evidence was nothing." Both these witnesses were contradicted on material points by other witnesses.

It was also proven that, after midnight on Friday night, precise hour not specified, some of the slaves on W. Kidd's place heard a gun fire in the direction of the place where the body was found.

It was shown that Moore was a strict disciplinarian, and usually visited the quarters on at least two nights in the week, and sometimes twice a night, to ascertain if the slaves were all at home; that he had visited the quarters for this purpose on Tuesday night. He did not visit the quarters on Friday night.

It was shown that Caleb was of good character and obedient, and had not been whipped since he was sixteen years old.

Running on one side of the field near which the body was found, was a road leading to A. Kidd's; on the opposite side was a road leading from the horse-lot on W. Kidd's place to Vaughan's; on a third side was situated the house and quarter of W. Kidd; on the fourth side was the wood in which was found the body of the deceased. The cabin in which the prisoner lived, and in which he was when he started to see his wife, was near the horse-lot, and the nearest way from that cabin to Vaughan's quarter was by the road leading from the horse-lot, as before stated. The house in which

Moore lived was about forty yards distant from this cabin, and a direct line from that house to Vaughan's would have run through this field, and within thirty yards of the place where the body was found.

The theory of the state was that Caleb did not travel the road, from fear of the "noisy man," or from fear of detection, and went across the field; and that Moore, seeing him thus going, ran around on the road leading to A. Kidd's, and intercepted prisoner in the wood, and that there a rencounter took place; and that Caleb killed Moore by either breaking his neck or suffocating; and that after life was extinct, he made the wound in the pit of the stomach to ensure death; and that Moore, in the struggle, fired his pistol at Caleb, and missed him. But it was shown, in opposition to this theory, that the road leading from the horse-lot was the one universally traveled from the quarter to Vaughan's; that there was no road or path through the field (which was then freshly plowed) or through the wood; and that Caleb was not the owner of a knife with which the wound could be inflicted; and that if Caleb wished to avoid detection in going to see his wife, the road was better, because, if he went through the field, he must necessarily go through a space in which he could be seen from the overseer's house.

The jury returned a verdict of guilty, and the prisoner then moved for a new trial, because, 1st. The verdict was contrary to the law and evidence; 2d. Because the court, in permitting witness Neillson to give his opinion as to the character of the instrument with which the wound was inflicted, erred; 3d. Because the jury were exposed to improper influences.

The testimony offered in support of the third ground for a new trial was the testimony of the two bailiffs in charge of the jury; and from their testimony it appeared that the case was finally submitted to the jury to consider of their verdict about ten o'clock at night; that there were two sworn bailiffs, and that they immediately took the jury to a room in a hotel about three hundred yards distant from the court-house, to consider of their verdict; that in going to the hotel, the jury were all kept together, one of the bailiffs preceding the jury

and one following them; that no person had any communication with them during the time they were considering of their verdict; that they were locked up in a room at the hotel, and the bailiff had the key to the door; that while they were considering of their verdict, the bailiffs occupied the adjoining room, and that the door between the two rooms was slightly ajar, so that the bailiffs could see into the room where the jury were; one of the bailiffs was all the time present in this adjoining room; and that neither of the bailiffs knew what the verdict was until it was read in open court.

It did not appear how long the jury were considering of their verdict. It appeared that, during the trial, the state and prisoner had consented that the jury, under the charge of the bailiffs, should take their meals at the hotels, and the bailiffs assigned this consent as a reason why they permitted the jury to go there to consider of their verdict, instead of to a jury-room in the court-house.

The facts in relation to the exception taken to the testimony of witness Neillson are fully set out in the opinion of the court. The court overruled the motion for a new trial, and the prisoner excepted, and sued out this writ of error. ·

*G. R. Clayton* and *B. Matthews*, for plaintiff in error.

1. On the point of the testimony of experts, cited, 1 Greenl. Ev., 440; Stark. Ev., 154; Phill. & Am. Ev., 809; Tait, 433; Hawthorn v. King, 8 Mass., 371; Hodge v. Fisher, 1 Peters' C. C. R., 163; Folkes v. Chaddell, 3 Doug., 157; NcNally Ev., 329–335; Mendum v. Commonwealth, 6 Rand., 704; Tullis v. Kidd, 2 Ala., 648; 1 Bouv. Law Dict., 545.

2. On the point that the conduct of the jury vitiated the verdict, Hare's case, 4 How., 187; Bole's case, 13 S. & M., 398; McQuillen's case, 8 ib., 596; Organ's case, 26 Miss., 83; Pope & Jacobs v. State, 36 ib., 121; Ned and Taylor v. State, 33 ib., 372.

3. That the evidence did not sustain the verdict, Algheri's case, 25 Miss., 589; U. S. v. Jones, 1 Wash. C. C. R., 372; 3 Phill. Ev. (Cow. & Hill's Notes), 451, notes 283–285, 288; Hart v. Newland, 3 Hawks, 122; Atwood's case, 4 City Hall Re-

corder, 91; Plunket's case, 3 ib., 137; 3 Stark., 497; 2 Phill. Ev., 386; 3 Greenl. Ev. (3d ed.), 137; Hodges' case, 2 Lewin C. C. R., 227, and note; McCann v. State, 13 S. & M., 497.

4. In relation to the changes in body, and wound after death, Wharton & Stille Med. Jurisprudence, 546, § 806.

*C. R. Crusoe*, for the state,

Filed an elaborate written argument, insisting that the verdict could not be set aside; that it was not clearly against the evidence, or without evidence, and that only in such cases would this court set aside à verdict in a criminal case, especially where there were two concurring verdicts of guilty. On this point he cited and relied on the following authorities: Cicely's case, 13 S. & M., 213; McCann's case, ib., 497; 1 Stark. Ev., 577, 502, 497.

On the testimony of experts, see 1 Greenl. Ev., 440, and cases cited.

SMITH, C. J.:

This was an indictment for murder, tried in the circuit court of Lowndes county, upon which the plaintiff in error, a slave, was convicted. A motion was made for a new trial upon the following grounds, to wit: 1. Because the verdict of the jury was contrary to law and the evidence; 2. Because the court erred in permitting a certain witness to give his opinion as to the instrument with which the wound upon the body of the deceased was inflicted; and 3. Because the jury were exposed to improper influences by the misconduct of the officers placed in charge of them. Which motion being overruled, the prisoner excepted, and prosecutes this writ of error.

The exceptions to the judgment are based upon the same grounds relied on in support of the motion for a new trial. We shall reverse the order pursued by counsel in assigning the causes for a new trial.

1. It is insisted that the judgment should be reversed, and a new trial granted, because the jury retired from the court-room to a room at a public hotel in the town of Columbus, through

the public streets, at night, to consider of their verdict, without the consent of the court or the counsel for the defendant.

Affidavits were read in support of the motion. From the evidence thus furnished, it is clear that the conduct of the bailiffs in charge of the jury was unauthorized and illegal, and should have been severely reprehended by the presiding judge. But it is settled that it is not every improper or illegal act of the officer in charge of the jury, or of the jury themselves, which will constitute just cause for setting aside the verdict. 36 Miss. R., 136.

The question here to be considered is not whether the bailiffs in charge of the jury, in conducting the jury through the streets of the town to a room at the hotel, were guilty simply of a violation of duty, but whether, by such improper conduct on their part, the jury were exposed to influences which might have affected the purity of their verdict. If they were so exposed, according to the long and well-settled doctrines of this court, unless it were also affirmatively shown that such influences failed of effect, their verdict would be suspected, and should therefore be set aside. Here, without noticing the evidence in detail, it is only necessary to say, that it appears with sufficient certainty that the jury were not subjected to improper influences, or placed by the conduct of the officers in such a situation as it was at all probable that such influences could be brought to bear upon them.

This exception is, therefore, unsupported and untenable.

2. It is next contended that the court erred in permitting Charles Neilson, a witness examined on behalf of the prosecution, to state his opinion to the jury as to the particular instrument with which the wound found in the breast of the deceased was inflicted.

This witness, in his examination before the jury, having described the locality where the deceased's body was found, its position upon the ground, the condition of the clothes, and other connected circumstances, stated that he was well acquainted with the difference in appearance between gunshot wounds and wounds made with a knife or sharp instrument; that his knowledge was derived from experience and observation; that he had

frequently seen gunshot wounds and wounds made with a knife, on the body of men; that in gunshot wounds the edges were depressed; in wounds made with a knife the edges were usually smooth, and the lips of the wound protruded; that he examined the wound on the body of the deceased. He saw but one wound on the body of the deceased. That was just below the breast-bone, in the pit of the stomach, directly in front; the wound appeared to be about one and a quarter inches long, and about three-quarters of an inch wide; that he had seen as much as a dozen gunshot wounds, and about the same number of cuts with a sharp instrument, on the human body; had seen the wounds on two persons in Mexico, who were said to have been shot in five or six places, and had seen the wounds on another person who was said to have been cut with a knife in five or six places, and had seen cuts made by medical men in lancing swellings on the human body; that all the knowledge he had in relation to the character of wounds is derived from having seen these persons, and from experience and observation; that gunshot wounds are rough, and cuts smooth; the body of deceased was in a state of putrefaction, and he had never seen a wound when the body was in a state of putrefaction before.

Having testified as to these facts, the witness was asked by counsel for the prosecution to state to the jury whether the wound he had described, on the body of the deceased, had the appearance of a gun-shot or pistol-shot wound, or of having been made with a knife or sharp instrument; which question was objected to, but the objection was overruled, and the witness permitted to answer. The witness stated in reply to said question, "That the wound below the breast-bone of the deceased (the wound he had described) was made with a knife."

As a witness is called for the purpose of deposing as to facts only, as a general rule he is not permitted to express his opinion upon a particular question, whether such question arise upon a fact stated, or a combination of facts, admitted or proved. Notwithstanding this is the general rule, there are some classes of witnesses who may deliver their opinions. For example, " On questions of science, skill, or trade, or others of the like kind, persons of skill, sometimes called experts, may not only testify

to facts, but are permitted to give their opinions in evidence. Thus, the opinions of medical men are constantly admitted as to the cause of disease or death, or the consequences of wounds, &c., and also as to other subjects of professional skill." Roscoe's Cr. Ev., 166, 167; 1 Greenleaf's Ev., § 440; Jones v. Finch, 37 Miss. R. 461.

There was not a particle of evidence before the court, except the statements of the witness himself, which tended to prove that he possessed the knowledge or skill requisite to enable any one to form an intelligent opinion on the subject about which he deposed. The witness was not offered as a person skilled in the science of medicine or surgery; and he did not himself pretend to any knowledge in either of those branches of science. He states his entire knowledge and experience in regard to wounds made upon the human body by gun-shot and by sharp-edged instruments. From his own statements, it is most manifest that he was not embraced in any class of witnesses, made exceptions to the general rule above laid down.

The court therefore erred in permitting the question to be propounded to this witness, and his answer to go to the jury as evidence. And the error here committed may have had an important effect upon the verdict; for without proof that the mortal wound was inflicted by means of a knife or some sharp-edged weapon, as no knife or sharp-edged weapon was found near the corpse of the deceased, the jury may have doubted, under all the circumstances proved, whether the deceased fell by his own hand or that of an assassin. For this error the judgment must be reversed.

3. The last exception which we shall notice, points to the error alleged to have been committed by the court in overruling the motion for a new trial. The ground assumed, and which was mainly relied on for a reversal of the judgment, is, that the verdict was not warranted by the evidence in the case.

When this cause was before us on a former occasion, the only question presented by the record was the same question which we are now considering. We were then well satisfied

that the evidence did not justify the verdict, and, consequently, remanded the cause for a new trial. The evidence contained in the record before us does not present the case in a materially altered aspect; and after a careful and patient examination of the facts, and the law applicable to them, we have arrived at the same conclusion. As we reverse and remand the cause, and as there will, probably, be another trial, without proposing to go into a detailed examination and minute comparison of the testimony of the numerous witnesses, we deem it proper to submit some general observations upon the prominent features of a transaction which, after searching and repeated examination, remains shrouded in impenetrable mystery.

It appears that William Moore, the subject of the alleged homicide, lived on the plantation of William Kidd, in the county of Lowndes, in the capacity of an overseer. He had no family, and was the only white person who resided on the plantation, and the sole occupant of a house in close proximity to to the quarter. There were nine negro men under his charge, as overseer, one of which was the accused, a slave of excellent character, and foreman on the plantation. He was constantly followed by a fierce dog, much attached to his master. On Friday, the 23d of April, 1857, Moore was seen by a witness sitting in his house after supper. On the following morning, when a servant went to make a fire in Moore's house, the door was open, Moore was absent; his bed appeared not to have been occupied the preceding night; everything was in place, and nothing indicated that the room had been the scene of violence and murder. Having in his possession the keys of the corn-crib and mule-lot, his absence was known by the negroes at daylight, at least very early in the morning; and as he did not return, information of his absence was conveyed to the neighbors, who commenced a diligent search for him, which was continued until the afternoon of the 27th, when his dead body was found at a distance of two hundred and fifty or three hundred yards from his house, in a wood beyond a field which lay in front of the house.

When the body was discovered, it was lying on the stomach and breast; the face rested on one arm, and both arms were

extended and the hands clasped. The boots were off; one was under the face, and the other a few feet distant. An empty pistol of small calibre was found lying near the body, which appeared to have been recently discharged. No knife or other sharp-edged weapon was found. The clothes were smooth and unrumpled. Upon turning the body over, a wound was discovered in the stomach just below the breast-bone. According to some of the witnesses, the vest and shirt were buttoned so that the wound could not be perceived until they were opened; but according to others, the bosom was open, so that the wound was seen as soon as the body was turned over. Very little blood had escaped from the wound. A small quantity of blood, just under the wound, as the body lay on the ground, was discovered, and the clothes were neither cut nor stained with blood. The body was much swollen and very offensive. The wound, when first observed, was about one and a half or two inches in length, and three-quarters of an inch wide. The lips of the wound were smooth, and not depressed, but protruded. No *post mortem* examination was made to ascertain the kind of weapon with which the wound was inflicted. This was the only wound upon the body of the deceased. There were, however, marks and discolorations of the skin on different parts of the body, which might have been the effects of violence; but as decomposition had commenced, it is more probable that they resulted from a different cause.

These facts, distinctly proved, appear to be conclusive against the assumption that the deceased fell by his own hand. And as it is in the highest degree improbable, upon the supposition that the shirt and vest were open at the moment when he received the fatal wound, so that both vest and shirt escaped injury, that after having slain his victim, the assassin should have taken off the boots, buttoned the shirt and vest, and turned the corpse upon its face, and as there was neither rent nor cut in the shirt or vest, it is impossible that the deceased's clothes were on, with the shirt and vest buttoned up, when the wound was inflicted, whether by a knife or pistol; and moreover, as it is equally improbable, if not absolutely impossible, upon the supposition that the wound described by the wit-

nesses was the cause of the death, and that it was inflicted where the body was found, that there should not have been a greater effusion of blood, and that the clothes found upon the deceased, particularly the shirt and vest, should have been unstained by a single drop, the supposition that the actual scene of the murder. was the place where the dead body was found must be utterly rejected.

Discarding, then, as well the hypothesis of suicide as the supposition that the homicide was committed where the body was discovered, the question, "Where was the actual scene of this mysterious tragedy?" naturally presents itself.

It is manifest that the evidence furnishes no clew to guide us to any satisfactory conclusion.

For, first, if it be assumed that the deed was not perpetrated at the place where the body was found, but the body was conveyed there afterwards, the conclusion is inevitable, that more than one person was concerned in the murder. And assuming this to be the fact, as it was proved, that the deceased was in his house after night on Friday, the 23d, and there was no evidence that he afterwards left the plantation, the inference would be natural and reasonable, that some point adjacent to the deceased's house or the negro quarter was the actual scene of the homicide. But many circumstances, clearly proved, render this supposition highly improbable. Nevertheless, if it be assumed that the deceased met his death at or near his house, or anywhere else on the plantation, it is certain that the proofs were insufficient to create even a probability of the guilt of the accused.

And, secondly, as there was no direct evidence that the deceased left his house and went away from the plantation on the night of the 23d, the facts in conflict with the supposition that he was killed on the plantation are the only circumstances which can authorize the belief that the deceased met his death at some place in the neighborhood. But if it were assumed, as proved, that the deceased did, in fact, leave home on that night, that he met his fate somewhere else, and that after the murder was consummated, the body was conveyed to the place where it was found on the 25th, it is manifest that independent facts, not proved, must be assumed, or inferences from assumed facts must

be resorted to, in order to connect the accused with the alleged offense. For example, it must be assumed, that while absent from the plantation the deceased and the accused did encounter each other on that night; or it must be inferred from some assumed fact, or inferred from the inferences drawn from the facts proved, that such encounter did take place, and, therefore, that the accused had an opportunity to commit the alleged offense. It was in proof, that the accused left home on that night to visit his wife at Vaughan's, and let it be admitted, that on his way there he was intercepted by the deceased, and that a conflict ensued, it is nevertheless highly improbable, if not impossible, that in such rencounter the latter was slain. The very small effusion of blood which occurred, the fact that there was neither rent nor cut in the shirt or vest, which covered the wound, and the fact that no part of the deceased's clothing was blood-stained, seem to be conclusive against the supposition not only that the homicide was committed where the body lay, but especially, that the mortal wound was inflicted by the use of any species of firearms, or with a sharp-edged weapon.

Then, discarding each of these suppositions, and they are the only ones entitled to consideration, we are left to vague conjecture as to the actual scene of the murder.

In respect to the more material inquiry, " Who was or were the guilty agent or agents in this transaction? " the evidence is not much more satisfactory. And after a careful examination of the facts proved on the trial, tending to establish the guilt of the accused, and giving to each of them separately, and to all of them combined, their due legal weight, while in view of two concurring verdicts, declaring the guilt of the accused, we are not prepared to say that there are not strong grounds for suspicion, we are well satisfied that the proofs were insufficient to authorize a conviction.

Judgment reversed. new trial awarded, and cause remanded for a new trial.