HERRING *v.* STATE.

[84 South. 699, In Banc. No. 20914.]

1. CRIMINAL LAW.  *Homicide.  Witness may not express his opinion
    that tracks near scene of homicide were defendant's tracks;
    where evidence is circumstantial, the character of footprints
    near scene is competent.*
    In a homicide case, where all the testimony for the state is cir-
    cumstantial, it is competent to show the character of footprints
    and tracks at or near the scene of the homicide, where the wit-
    nesses have made comparisons or are in position to testify to
    measurements, comparisons, or any peculiarities, but it is not
    competent for the witness to say that two tracks are the same,
    or to express his opinion on the subject; it being for the jury
    to draw the conclusions from the testimony and to decide from
    all the facts deposed to whether the tracks testified to were in
    fact defendant's tracks.

2. CRIMINAL LAW.  *No presumption that defendant made tracks or
    wore shoes that made them.*
    There is no presumption that the defendant in a homicide case
    made tracks at or near the scene of the homicide or wore the
    shoes that made them.  Before the tracks can be weighed against
    the defendant, it must be shown by the evidence that he made
    them or wore the shoes that made them.

3. CRIMINAL LAW.  *Witnesses' comparison of tracks at scene of
    homicide held incompetent and prejudicial.*
    The statements of the witnesses that certain tracks or footprints
    "compared all right, they looked to be the identical shoes" be-
    longing to or worn by the defendant, were incompetent, and, in
    a close case depending altogether upon circumstantial evidence,
    is prejudicial to the rights of the defendants.

4. HOMICIDE.    *Where defendant has put his general reputation in issue, particular offenses to impeach him may not be shown.*

On the trial of a homicide case, where the defendant has put his general reputation in issue, it is not competent nor relevant to admit in rebuttal on the part of the prosecution evidence of a series of independent acts or particular offenses or crimes tending to impeach the defendant's good reputation.

5. HOMICIDE.    *Evidence for prosecution tending to refute good reputation of colored defendant held erroneous.*

On the trial of a colored man for murder, where the defendant put in issue his general reputation for peace, it was error to permit the prosecuting attorney to inquire into an alleged prior assult by ·the defendant with a deadly weapon upon a white man, as tending to refute the good reputation or character of the accused thus put in issue, and thereby to inject into the trial and make wrongful appeal to race prejudice.

APPEAL from circuit court of Jefferson Davis county. HON. W. A. SHIPMAN Special Judge.

Marshall Herring was convicted of murder, and he appeals.    Reversed and remanded.

*Livingston & Milloy,* for appellant.

*Frank Robertson,* Attorney General, for the State.

STEVENS, J., delivered the opinion of the court.

Appellant was indicted, tried, and convicted of the murder of one Gus Jefferson, and sentenced to life imprisonment in the penitentiary.

Gus Jefferson, a colored man, was shot and instantly killed at his home as he sat by an open screened window just after dark, or between 8 and 9 o'clock on a July evening. He was shot in the back, and upon investigation there is evidence of nine buckshots penetrating his body and nine holes in the wire screen of the window. The sheriff of the county was phoned for immediately and made an investigation, but no evidence could be

obtained that night leading to the identity of the criminal agent. Early the next morning the negroes organized two searching parties who started from the house of the deceased in search of evidence. One of these parties, three in number, went west along the neighborhood or settlement road which passed by the home of the deceased, and, just after passing the home of the nearest neighbor, one Coy Nichols, and some three hundred and seventy-five yards from the home of the deceased, they discovered in the sand in the road two or three tracks of a person who, according to their testimony, appeared to be running and wearing a No. 9 shoe. They proceeded further along this road some seventy-five yards, but without being able to discover or see any other tracks similar to the tracks which they saw in the sand, and left the highway, went out into an old field or pasture near the highway, and there accidentally saw signs of where a horse had been hitched to a sweet gum bush. These appearances consisted of the grass being trodden down, signs where the reins of the bridle or halter had marked the trunk of the tree, and some thirty yards from the sweet gum bush the tracks of a horse could be observed coming and going. One of the party observed on the ground and picked up a small scrap of cloth, which the witness terms "a blue calico rag." with a knot tied in one end, and observed hanging to the sweet gum bush a small strand of a grass rope. The tracks of the horse indicated by the imprint a peculiarity in one of the front hoofs of the animal, and the witnesses undertook to testify that these tracks of the horse were followed across the woods and along a settlement road to within a short distance of the home or barn of Marshall Herring, the appellant.

There is some evidence that the tracks of the horse turned out of the road near appellant's barn and went in a northern direction opposite defendant's house, but the searching party when in sight of the defendant's

home left the horse's tracks and went into a cultivated field where Marshall Herring was at that time plowing a mare that had a broken hoof. John Price, one of the searching party, thereupon accosted the defendant, remarked that they had "lost Brother Jefferson last night," and proceeded to ask the defendant what he was doing over there the night before. The defendant was at the time barefooted, and John Price thereupon asked the defendant if he objected to his foot being measured and defendant responded, "No; not at all;" and thereupon Price approached the defendant as if to measure his foot, but before doing so called out to his companions, "Boys, grab him, I've got him," and thereupon the three negroes laid hands upon the defendant and placed him under arrest, and one took charge of the horse. At the same time one of the party observed a very small scrap of calico on the reins of the defendant's horse which the witnesses say corresponded with the piece of cloth found under the sweet gum bush. The witnesses thereupon stated to the defendant, "We have tracked you and your horse from Gus Jefferson's house, and you are the man who killed Gus Jefferson." The defendant responded that he knew nothing about it; that "my horse might have gone there, but I didn't." .

Near the same time a party of white men and boys were told of what the negroes had found and undertook to follow the trail or tracks, and two of the white men went to the defendant's home and found under his bed a single-barrel shotgun with an empty shell in it. They also found and took charge of a pair of shoes referred to in the evidence as defendant's "Sunday shoes." On the trial there was evidence that the defendant had borrowed a loaded shell from Dave Oatis, one of his neighbors and a brother-in-law of the deceased, Gus Jefferson. The shell which Oatis loaned the defendant was a buckshot shell and was loaned some month or more prior to the time of the homicide. The defendant was

asked when and how he shot the Dave Oatis shell, and while under arrest made different statements, saying to one that he shot the Dave Oatis shell at a rabbit, to another that he shot it at a polecat, to another at a bird. Admissions of the defendant are in evidence that in the late afternoon or early evening of the day of the homicide after his day's work he rode his mare with the defective hoof in search of some horses that were running loose, but that he was only gone some fifteen or twenty minutes, that he came back before dark and put his horse in the stable, then went to his home, had supper, and after supper joined his wife in robbing a beehive. The wife and son of appellant testified, and both admit that defendant rode off after his horses, but testify that he was not gone very long. Neither the sheriff nor any of the witnesses took any accurate measurement of the defendant's foot or of the pair of shoes, and did not take the defendant to the tracks found in the highway near Coy Nichols' home and compare defendant's tracks with the tracks in the sand, and they did not make such comparison with the shoes of the defendant. The witnesses did employ a stick in measuring the tracks in the sand and notched the stick, but the stick was not preserved and introduced in evidence. They likewise measured with a stick the hoof of the horse, but this measurement was not preserved or offered in evidence. The settlement road by the defendant's house ran east and west, and north across the road there were bushes and undergrowth. None of the witnesses found any tracks either about the yard, front gate, or in the road immediately in front of the defendant's house, or anywhere about the dwelling house nearer than the sandy strip of highway near Coy Nichols' home, and no testimony was introduced that the defendant was seen at or near the scene of the homicide; in other words, all the testimony in the case is circumstantial.

There is testimony that a piece of wadding from a shell was picked up in the yard of the deceased, and that this wadding was compared with the wadding in a loaded shell belonging to Dave Oatis and corresponded. Dave Oatis likewise exhibited a loaded buckshot shell which he identified as exactly like the shell which he loaned or gave to the defendant, and the contents of this loaded shell were introduced before the jury. Investigation of the contents of this loaded shell showed that it contained nine buckshot. This evidence was introduced over the objection of the defendant.

Several of the witnesses were asked general questions which may be illustrated by the following taken from the testimony of S. G. Magee, the sheriff of the county:

"Q. How did the tracks compare with the foot of the horse which you examined? A. Why, I didn't see the tracks together, but they looked just alike."

And again from the testimony of John Price: "Q. How did the shoes compare with the size of the track which you told us about? A. It compared; from every appearance it was the same shoe."

When John Stamps was testifying, the learned district attorney interposed a statement: "We submit the witness is trying to give his best opinion."

The witness referred to was undertaking to say that he looked at the track, and, while he was not positive of the size of the shoe which made the track, stated: "I think though it was 9 or 10."

Dave Oatis was asked: "How did the tracks that you found in the sand by Coy Nichols' house compare with the shoes of the defendant that he wore to jail? A. They compared all right. They looked to be the very identical shoes"

Price is the only witness who undertook to measure the man's tracks, and this he did by placing the stick lengthwise the tracks, but the shoes were never meas-

ured by the same notched stick; the shoes were never placed in the tracks, and there was no peculiarity either in the tracks of the man or of the shoes of the defendant. No witness saw the horse hitched to the sweet gum tree, but the witnesses testified that the signs made by the horse appeared to be fresh. It is difficult to gather from the record exactly how far it is from the deceased's home to the sweet gum tree where the horse was hitched, but approximately it is some five hundred yards. Search was made for cloth similar to the rag found under the bush and on the bridle, but no such cloth could be found in the defendant's home.

The defendant put in evidence his general reputation for peace and violence in the community in which he lived, and the witnesses on direct examination stated that his general reputation was good. But on cross-examination by special counsel for the state the following inquiry into a specific act of violence was made:

"Q. You never heard any of them discuss his general reputation for peace or violence in connection with the assault he made on Mr. Milton Polk? (Objection. Overruled.)   Q. Have you heard about the difficulty he had with Mr. Milton Polk in which he made an assault on him?  .  .  .   Why' didn't you tell us about it?  A. I had never heard the particulars. I Just heard he had some trouble. Q. Mr. Polk is a white man?  A. Yes, sir."

And from another witness on cross-examination:

"Q. Well, did you discuss the difficulty he had with Milton Polk? Did you hear about that difficulty?  A. I hear a little about it.  Q. Mr. Polk is your neighbor? A. Yes, sir. Oh, I heard some talk about that trouble but I don't know the particulars. Q. His difficulty with the white man made no difference to you? A. I didn't know there was any difficulty. Q. Did you hear about him going onto Mr. Polk and wanted to have it out right then? A. No, sir. Q. Now it made no difference

with you if he had a difficulty with a white man? A. I didn't know anything about that."

Other similar questions were propounded. All of this testimony was objected to by the defendant, and the objection was at first overruled. After all the testimony was in the defendant made a motion to exclude this particular evidence, and this motion was thereupon sustained.

There was an attempt to prove a confession. One Willis Bourn, colored, says he went to the jail and spoke to the defendant, asked him how he was getting along; thereupon the defendant said he was mad, and the witness then asked the defendant, "Well, how did they manage to get you in it?" Witness testifies that the defendant then said, "Well, I don't know: last night I thought I had everything all right, but this morning they tracked me from Gus's to where my horse was hitched and tracked my horse from there home." Witness thereupon broke into the conversation and volunteered the expression, "Well, I would not tell anybody else what you have told me." The defendant then added, "So they say, and swear to it."

It is the contention of counsel for appellant that this was manifestly an unfair witness who undertook to place a wrong construction and version upon what the defendant was simply narrating as the testimony which the state's witnesses were ready to swear to. Counsel for the state contend that it is a confession tending to show guilt.

According to our interpretation of the testimony, there was no adequate showing of any motive. The defendant lived at least two miles from the deceased. The record is voluminous, and no attempt is now made to set out all the testimony either for the state or for the defendant. There is testimony on behalf of the defendant that tends strongly to prove innocence.

The main points argued on this appeal are: (1) That the testimony is insufficient to support the verdict of guilt; (2) the court erred in permitting the witnesses to express general conclusions and their opinions about the tracks; (3) that it was error to permit the state to introduce the loaded shell identified by the Witness Dave Oatis as the same kind of shell which he had theretofore loaned to the defendant, and to exibit the contents of this shell before the jury; (4) that it was error to permit counsel for the state to cross-examine the character witnesses as to particular acts of violence and to refer to a previous alleged assault which the defendant, a colored man, had made upon Milton Polk, a white man in the community, thereby injecting, it is alleged, race prejudice; (5) that the alleged confession was incompetent, and especially that the court erred in refusing to permit defendant's counsel to press the witness Bourn as to what the defendant meant by his statements above quoted; (6) that, while the instructions contain the predicate that the proof must be beyond all reasonable doubt and to the exclusion of every other reasonable hypothesis than that of the guilt of the defendant, they should have defined circumstantial evidence; further, that the instructions used the word "convince" instead of the word "believe."

There can be no doubt but that Gus Jefferson, the deceased, was deliberately assassinated at night as he sat in his home with his back toward a screened window. There was a criminal agent. But all the facts tending to identify the criminal agent make this an exceedingly close case. Immediately after the alarm was given there was excitement and minute investigation for any clue pointing to the guilty person. There do not seem to be any tracks which attracted the attention of any one nearer than three hundred and seventy-five yards from Gus Jefferson's home. The few tracks then noticed were in the highway that ran east and west by the home of the deceased, and the searching party was either unable or

failed to follow these tracks any material distance. It was not the tracks of a man which led the searching party from the highway out into the old field where there was evidence of a horse being hitched to the sweet gum bush. But for some reason, unexplained, the three negroes, more accidentally than otherwise, stumbled upon the scenes about the sweet gum bush and there tracked a horse to the defendant's house. With the premise that "this horse had a rider," learned counsel for the state build a goodly part of this argument. There is probative value in other circumstances: That the scrap of calico under the bush corresponded with the scrap of calico tied to the bridle of the defendant's horse; that the defendant is shown to have left his home about sundown riding this particular horse; that the empty gun was found under the bed, and the shell identified as the same kind of shell which Dave Oatis had purchased and loaned defendant; the contradictory statements by the defendant as to how he had shot the Dave Oatis shell.

The main assignment that the proof was insufficient has required from the court a very close examination of the record and a protracted consideration of the testimony. We have concluded that on the whole case it is one for the jury.

But the very fact that the case is exceedingly close renders more significant any errors committed by the trial court. Two of the assignments merit discussion and require, in our opinion, a reversal of the judgment appealed from. The first assignment which we shall briefly notice is the one pertaining to footprints and the tracks of the horse. We understand the law to be that it is competent to show the character of footprints and tracks at the scene of the homicide where the testimony shows that the witnesses have made a comparison and are in position to testify to the measurements or comparisons or any peculiarity. But, as stated by Mr. Wharton, the applica-

tion of the general rule "has led to a very great conflict of opinion."

In *Cumberland* v. *State,* 110 Miss. 521, 70 So. 695, a witness expressed his opinion that it "looked like there had been a crap game there." Our court condemned this character of testimony, holding the witness "should have stated the facts and let the jury draw the conclusion therefrom."

In *Clough* v. *State,* 7 Neb. 320, the court ruled that it was not competent for a witness to say that the track of a horse leading from the place where the body of the deceased was found was made by the horse which the defendant was known to have ridden, and that the witness could not express an opinion or state that he believed that the tracks were so made.

In *Terry* v. *State,* 118 Ala. 79, 23 So. 776, the court says: "It was competent for him to testify that he measured the tracks coming and going from the place of the homicide, and compared them with the track made by defendant the next day; and they corresponded in given particulars; but it was not competent for him to say that the two were the same, nor to give his opinion on the subject at all. He should have stated the facts of identification, and it was for the jury to find, from all the facts deposed to, whether they were defendant's tracks or not."

In *Livingston* v. *State,* 105 Ala. 127, 16 So. 801, the court condemned the testimony of the witness that the defendant wore a No. 6 or 7 shoe, and "these tracks corresponded, in his opinion, with the track of defendant."

It is said in Cyc. vol. 12, p. 393: "Evidence of the comparison of footprints found near the scene of the crime with the measurements of the footwear of the accused in relevant to identify the accused."

*Spell* v. *State,* 89 Miss. 663, 42 So. 238, is in point. In that case the defendant asked for an instruction stating to the jury that—"There is no presumption that defend-

ant made tracks between his home and that of Madame Quick, or that he wore the shoes that made them. Before the tracks can be weighed against him, it must be shown by evidence that he made them, or wore the shoes that made them."

Our court, by WHITEFIELD, C. J., remarked: "This was a perfectly correct instruction, peculiarly applicable on the question of identity, and should have been given as asked."

In *State* v. *Green*, 40 S. C. 328, 18 S. E. 933, 42 Am. St. Rep. 872, the second headnote reads: "On a criminal trial a witness may testify to the peculiarities of the foot of the accused, and how these peculiarities were reproduced in a certain foot track; but he cannot give his opinion that such track was made by the accused."

It should be remembered that in the case at bar the defendant was not carried to the sandy place in the highway where the footprints were in evidence, and the testimony of any comparison of the footprints either with the defendant's foot or his shoes is meager and most general. The statement in evidence that "they compared all right, they looked to be the very identical shoes," was incompetent and perhaps prejudicial in this case, where the identity of the criminal agent was the sole inquiry, and all the evidence was circumstantial. As stated by Mr. Wharton, p. 1557: "That a man could have done a wrongful act is by itself no sufficient proof that he did it."

It was clearly incompetent and highly prejudicial to permit special counsel for the state to interrogate the character witnesses about an alleged assault committed by the defendant upon one Milton Polk, a white man. Upon cross-examination of several witnesses there was a searching inquiry into this alleged assault said to have been committed by the defendant with a deadly weapon. This testimony was incompetent for two reasons: (1)

"It is not competent nor relevant to the issue to admit in rebutal on the part of the prosecution evidence of a series of independent facts, each forming a consistuent offense, or, in other words; evidence of particular facts or crimes tending to impeach the defendant's good reputation." Wharton' on Criminal Evidence (10th Ed.), vol. 1, section 61. (2) There was a wrongful appeal to race prejudice. In *Kearney* v. *State,* 68 Miss. 233, 8 So. 292, Judge COOPER, speaking for this court, declared the true rule that "neither the accused nor the state can resort to particular facts to establish or refute the character thus put in issue," and, further, that the accused "cannot be expected to be able to defend particular acts, nor it is just that, failing so to do, the burden of guilt in reference to a particular disconnected transaction should be fixed upon him, and the motive or malice thus discovered imputed to the separate fact under examination." To the same effect is *Brown* v. *State,* 72 Miss. 997, 17 So. 278.

Mr. Wigmore makes a significant statement that this testimony "is objectionable, not because it has no appreciable probative value, but because it has too much. The natural and inevitable tendency of the tribunal, whether judge or jury, is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge." Wigmore on Evidence, vol. 1, section 194, p. 233. This eminent writer likewise condemns it because of the impossibility of the accused to refute any or all of the charges with which he is thus suddenly confronted. And so in the present case the defendant, a humble and helpless negro, was suddenly confronted with the vehement statements of special counsel for the state that the defendant had assaulted a white man with a gun and this white man had been compelled to repel the assault with a deadly

weapon. But it is here argued that, after all the testimony was in, the learned circuit judge then excluded this testimony from the consideration of the jury. But these inflammatory accusations had gone to the jury, and it was difficult for the trial judge by any word of his to neutralize the poisonous effect. This is a case where it was peculiarly the duty of the prosecuting attorney to be fair and impartial, and to test the guilt or innocence of the accused by a standard and rule prescribed and approved by the law of the land.

There was no adequate or clear showing of motive. The whole case for the state hangs by a narrow thread of circumstantial evidence.. The one issue of identity was and is a most delicate and important inquiry in this case. We do not see any error in the instructions or any material error beyond the two assignments discussed. But for the errors indicated we are constrained to give the accused a new trial. There is testimony in this record favorable to the defendant and consistent with innocence. Nothing but a reversal and new trial of this case would satisfy the conscience of this court.

*Reversed and remanded.*

ETHRIDGE, J. (specially concurring).

I concur in the conclusion that the cause should be reversed and remanded, and I am in agreement with the court upon the proposition that the case should be reversed because of the introduction in evidence of specific acts and difficulties elicited by the state from the defendant's witnesses testifying to his good character as to peace and violence, and especially the testimony that developed the difficulty between the defendant and a white man which was manifestly so prejudicial to the defendant that it could not be cured by an instruction by the court to disregard the evidence after it had already been admitted as legal evidence. I do not think that it was error for the court to permit a witness

for the state to testify as to the appearance of the tracks found near the house of the deceased in comparison with the tracks and shoes of the defendant. This evidence has but small probative force, but in proper cases, coupled with other evidence, may be important in making out a chain of circumstances showing guilt of persons accused of crime.

I think it was reversible error for the court to permit the evidence of a comparison of a loaded shell which contained nine buckshots and which was unloaded in the presence of the jury and used in evidence. I cannot see how this even tends to prove that the shell in the defendant's gun was loaded with like shot, and it certainly was prejudicial because it happened to contain the number of shot that went through the screen of the window at the house of the deceased and into his body killing him. There are millions of shells manufactured yearly in factories, and shells manufactured by one concern usually have a general likeness in appearance and are loaded with various sizes of shots, and various numbers of shots. There may have been thousands of shells of the exact kind and appearance in the county or state, but certainly it does not tend to prove that the shell in the defendant's gun was loaded with nine buckshots. There is nothing in the evidence to show how this particular shell was loaded, nor is there any testimony that all of the shells contained in the box from which the defendant was loaned one shell had nine buckshots, or how many they did have. It does not tend to prove that the shell in the gun was the identical shell borrowed more than a month before the killing from the state's witness, and, before this would have any probative force as evidence these facts must appear.

I think the case should be reversed because the testimony is insufficient to support a verdict of guilt. Taking the testimony as a whole, it is insufficient for that purpose under well-recognized rules governing circum-

stantial evidence. The testimony in the record before
us is persuasive, but not conclusive, and is therefore
insufficient to measure up to the standard of law war-
ranting convictions upon circumstantial evidence. The
rule governing circumstantial evidence is well stated in
*Algheri* v. *State,* 25 Miss. 84, Morris' State Cases, ·658,
in the headnotes, reading as follows:

"In the application of circumstantial evidence to the
determination of a case, the utmost caution and vigi-
lance should be used.

"It is always insufficient where, assuming all to be
proved which the evidence tends to prove, some other
hypothesis may still be true; for it is the actual ex-
clusion of every other hypothesis which invests mere
circumstances with the force of truth.

"Where the evidence leaves it indifferent which of
several hypotheses is true, or establishes only some
finite probability in favor of one hypothesis, such evi-
dence cannot amount to proof, however great the
probability may be."

The facts in the Algheri Case are incomparably
stronger than the facts in the present case, yet the court
held that the facts there established were insufficient to
warrant a conviction. I have always thought the facts
there established were very strong, and probably the
court now would uphold a conviction on the identical
facts shown in that case, but the rule of law there an-
nounced is the correct rule, and has been followed by
this court since its announcement.

The facts in the case before us are much weaker, in
my opinion, than those in several cases in which this
court has held the facts to be insufficient. *John* v.
*State,* 24 Miss. 569; Morris' State Cases, 608; *Caleb* v.
*State,* 39 Miss. 721; Morris' State Cases, 1490. There
were no tracks found at the house of the deceased, nei-
ther were there tracks traced from the house to the

points where the tracks were found in the road by blood-hounds or any other means known to the law. The fact that the tracks were found in the road beyond the next house and had the appearance of being made by a person running is far from being sufficient to establish the fact that they were the tracks of the accused or of the person who killed the deceased. Again, the place where the horse was found to have been hitched is not connected with the tracks found in the road, nor, by any logical reasoning, connected with the person who may have fired the shot. The horse may have been hitched by another person, and for another purpose, and at another time, so far as the testimony shows. There is no logical connection between the facts so as to warrant a conclusion that they constitute connecting links in the chain of circumstances. Again, there is nothing conclusive about the fact that the horse was hitched to the tree, and nothing to show that it was the same horse whose tracks were measured in the road, and which tracks correspond to the tracks of the defendant's horse. It further appears that there was another horse in the community which had a similar peculiarity in its hoof.

The fact that the piece of calico found on the bush in the woods where the horse was hitched corresponded in color to the piece of cloth on the defendant's bridle rein does not conclusively establish that they were from the same piece of cloth. It is quite likely that the bolt of cloth would be sold to many different parties; in other words, it is improbable that the defendant bought the entire bolt of calico, nor is it shown that he bought or possessed cloth of this kind in any unusual quantity, nor is it suggested that no other person in the community had similar cloth.

None of the facts introduced by the state connect so conclusively with other facts introduced by the state as to exclude every reasonable hypothesis, nor do all of them, taken together, exclude every reasonable hypothe-

sis of innocence. The contradictory statements of the defendant about the use of the borrowed shell has no affirmative probative value. Its only value is to discredit the defendant's defense, but does not tend to establish the state's contention.

The evidence shows that another person had similar shells which he used; that he lived in the community; that he had a horse which had a peculiarity similar to the peculiarity of the defendant's horse. There is no sufficient development of the facts as applied to him to show that it was impossible for him to have committed the crime. The evidence may be insufficient to convict any person of crime, but, where it appears that there is some probability or some suspicious circumstances pointing to the guilt of more than one party, circumstantial evidence is insufficient unless the circumstances are so developed as to show affirmatively that only one hypothesis can logically be indulged by the reasoning mind.

The policy of the law is that it is better for many guilty persons to escape punishment rather than one innocent man should be punished. And it is especially important that the humble, ignorant, and poor should be protected in the courts by a strict conformity to the application of the evidence; for often they are unable because of ignorance and poverty to secure the aid of friends and the investigation of counsel needed to clear up incriminating appearances which may surround them in such cases.

I think it was error to admit evidence of a conversation which the defendant and the witness Bourn had at the county jail. It is manifest to the reasoning mind that the defendant was in jail at the time of the alleged tracking and swearing there testified about, and that the statement made to the witness Bourn was more a narration of the testimony against him on the preliminary hearing than it was of the fact; in other words, it did

not amount to an admission of any incriminating fact, but, taken in connection with other suspicious circumstances and the surroundings of excitement and horror at the assassination, was convincing to those who entertained suspicions of guilt. In admitting circumstances and statements not in themselves admissions of guilt, great caution should be used, and all doubt as to admissibility and competency of such testimony be resolved in favor of the defendant. Unless the state can materially strengthen its case on a new trial, I cannot believe that under calm surroundings the defendant will be convicted on the evidence in this record. Presumably the state put forth all of the evidence at its command on the first hearing. In my opinion, judgment should be entered here for the defendant.